## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

RICKY YOUNG (#841298),

                **Plaintiff,**

       **v.**

THOMAS MONAHAN, *et al.*,

                **Defendants.**

**Case No. 07 C 1193**

**Hon. Harry D. Leinenweber**

### MEMORANDUM OPINION AND ORDER

Plaintiff, Ricky Young (hereinafter, "Plaintiff"), a detainee committed under Illinois' Sexually Violent Person Act (the "SVPA"), is currently in custody at the Rushville Treatment and Detention Facility. From 2000-2006, Plaintiff was detained at the Joliet Treatment and Detention Facility (the "Joliet Facility"). In 2007, he filed this civil rights action against mental health care professionals and employees at the Joliet Facility: Thomas Monahan, Darrell Sanders, Shan Jumper, Lea Chankin, Tarry Williams Judy Roth, Liberty Health Care Corporation, Tony Humphrey, Steven Strock, Scott Maieritsch, Mark A. Brenzinger, Moore, and Franzin (hereinafter, the "Defendants"). In January 2008, addressing a Motion to Dismiss by the Defendants, the Honorable John W. Darrah dismissed three of Plaintiff's five claims. Two claims remain: whether the Defendants acted with deliberate indifference to Plaintiff's safety by forcing him to share a room with a detainee referred to as D.M., and whether the Defendants treated Plaintiff

differently and refused to allow him to choose his roommate because Plaintiff is African American. In May 2008, the Executive Committee reassigned the case from Judge Darrah to this Court.

The Defendants have filed a Motion for Summary Judgment. Plaintiff has filed a response in his answer to the Defendants' Summary Judgment Motion, and the Defendants have replied. For the following reasons, the Court grants the Motion for Summary Judgment. This case is dismissed and terminated. All other pending motions are denied as moot.

## I.  SUMMARY JUDGMENT STANDARD

### A.  Summary Judgment under Federal Rule of Civil Procedure 56

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Intern.-Indiana, Inc.*, 211 F.3d 392, 396 (7th Cir., 2000).

In determining the existence of a genuine issue of material fact, the Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396.

The movant bears the initial burden of demonstrating that there is no genuine issue of material fact and that judgment based upon the uncontested facts is warranted. *See Celotex Corp.*, 477 U.S. at 325. If the movant meets this burden, the nonmoving party must "go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir., 2006) (internal quotation marks and citations omitted); *Celotex*, 477 U.S. at 322-26. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if a reasonable finder of fact could return a decision for the nonmoving party based upon the record. *See Anderson*, 477 U.S. at 252; *Insolia v. Phillip Morris Inc.*, 216 F.3d 596, 599-98 (7th Cir., 2000).

## B. Northern District of Illinois Local Rule 56.1 Statements

When addressing summary judgment motions, the Court derives the background facts from the parties' Local Rule 56.1 Statements, which assist the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence."

*Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir., 2000). Specifically, Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir., 2004). The nonmoving party must admit or deny each factual statement proffered by the moving party and concisely designate any material facts that establish a genuine dispute for trial. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir., 2005). Each party's statement should contain short numbered paragraphs including references to the record, affidavits, and other supporting materials. *Id.; see also Ammons*, 368 F.3d at 817.

Because Plaintiff is a *pro se* litigant, the Defendants served him with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by Northern District of Illinois Local Rule 56.2. The notice explains the consequences of failing to properly respond to a motion for summary judgment and to a statement of material facts under Fᴇᴅ. R. Cɪᴠ. P. 56(e) and Local Rule 56.1.

The purpose of a Local Rule 56.1 Statement is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir., 2006). The types of evidentiary material available to support a Local Rule 56.1 statement vary, but most commonly

include affidavits, deposition transcripts, and business documents. *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D.Ill., 2000). A litigant's failure to respond to a Local Rule 56.1 Statement results in the Court considering the uncontested statement as true. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir., 2006). Also, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-810 (7th Cir., 2005); *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir., 1997). Furthermore, a party may not satisfy his or her Local Rule 56.1 requirements for responses with "evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon*, 233 F.3d at 528.

Although courts must construe *pro se* pleadings liberally, see *Kaba v. Stepp*, 458 F.3d 678, 681 (7th Cir., 2006), a plaintiff's *pro se* status does not excuse him from complying with these Local Rules. *See Greer v. Board of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir., 2001); *see also McNeil v. U.S.*, 508 U.S. 106, 113 (1993) ("we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."). With these standards in mind, the Court turns to the claims and evidence of this case.

## II.  **FACTS**

In this case, the Defendants forwarded their Rule 56.1 Statement and a Rule 56.2 Notice to Pro Se Litigants to Plaintiff at least twice.  (R. 84-86, 89, 93.)  The Court also forwarded to Plaintiff copies of the Defendants' summary judgment motion, Rule 56.1 Statement, and a Rule 56.2 Notice.  (R. 92.)  Despite being served several times with a Rule 56.2 Notice, Plaintiff did not respond to the Defendants' Rule 56.1 Statement.  Accordingly, the Court may consider the uncontested statements in the Rule 56.1 Statement to be true.  *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir., 2006).  The Court notes, however, that the facts listed in the Defendants' Rule 56.1 Statement are supported by the record, such that the statements in the Rule 56.1 Statement of Facts may be considered true regardless of Plaintiff's failure to respond.  The uncontested facts show the following.

### A.  **Deliberate Indifference to Plaintiff's Safety**

Plaintiff is a civilly committed person under Illinois' SVPA, and was housed at the Joliet Facility from December 2000 to July 2006.  (R. 86, Defs.' Rule 56.1 Statement ¶ 2; R. 87-2, Exh. B, Pl.'s Depo., 6.)  Plaintiff was attacked by his roommate, D.M., on March 10, 2006, shortly after Plaintiff reported a fight between D.M. and another detainee.  D.M. walked up behind Plaintiff as they entered their cell and struck him several times on the right side of his head.  Officers broke up the fight, and Plaintiff was

immediately treated at the health care facility. Plaintiff sustained a cut above his lip and bruising and swelling on the right side of his head from D.M.'s assault. (R. 86, Defs.' Rule 56.1 Statement, ¶ 9; R. 87-2, Pl.'s Depo., 72-82.)

Plaintiff first learned that he was going to room with D.M. on January 20, 2006, when Defendant Dr. Mark Brenzinger (Plaintiff's therapist) informed him. Plaintiff told Dr. Brenzinger that he did not want to room with D.M. (R. 86, Defs.' Rule 56.1 Statement ¶ 12; R. 87-2, Pl.'s Depo., 31-33.) Plaintiff's desire not to room with D.M. was based upon three prior occasions where D.M. either flirted with or threatened Plaintiff. In 2005, D.M. once flirted with Plaintiff by asking him personal questions. Plaintiff did not then report the flirting to any officers. (R. 86, Defs.' Rule 56.1 Statement ¶ 26; R. 87-2, Pl.'s Depo., 36-37.) On another occasion in 2005, Plaintiff and D.M. were in the dining hall. D.M. was complaining about food being on the tables. Plaintiff responded that it was D.M.'s job to clean the dining tables. D.M. replied that he was going to hit Plaintiff in the mouth if he continued getting smart with him. Plaintiff testified that he told Dr. Roth (a group therapist) about the incident several days later, but did not tell anyone else. (R. 86, Defs.' Rule 56.1 Statement ¶ 28; R. 87-2, Pl.'s Depo., 18-19.) On another occasion several weeks later, Plaintiff and another detainee were having a conversation in the dining hall. D.M. attempted to join in the conversation, but

Plaintiff ignored him.  D.M. then said "something about killing me if I keep running off at the mouth."  (R. 87-2, Pl.'s Depo., 21-22; R. 86, Defs. Rule 56.1 Statement ¶ 30.)  Plaintiff did not report this incident to any staff members.  (R. 86, Defs. Rule 56.1 Statement ¶ 31; R. 87-2, Pl.'s Depo., 23.)

In response to Plaintiff telling Dr. Brenzinger that he did not want to room with D.M., Dr. Brenzinger explained that he had no control over the situation and was just relaying the message. (R. 86, Defs. Rule 56.1 Statement ¶ 14; R. 87-2, Pl.'s Depo., 32-33.) After Plaintiff's conversation with Dr. Brenzinger, Plaintiff went to complain to Defendant Moore (a Security Therapy Aide ("STA")).  Defendants Steve Strock (a Department of Human Services ("DHS") Administrator) and Dr. Scott Maieritsch (a therapist) happened to be in Moore's office.  Plaintiff told Moore, Strock, and Maieritsch that Plaintiff had concerns about rooming with D.M. Plaintiff told them that D.M. wanted either to have sex with Plaintiff or to beat him.  Plaintiff informed Moore, Strock, and Maieritsch that D.M. had twice before threatened Plaintiff.  Strock and Maieritsch responded that they would see if Plaintiff could have another roommate before having to share a room with D.M. Moore spoke to D.M. and told Plaintiff that D.M. would not put his hands on Plaintiff.  (R. 86, Defs.' Rule 56.1 Statement ¶¶ 12-18; R. 87-2, Pl.'s Depo., 33-36.)

Soon after the conversation between Plaintiff, Moore, Strock, and Maieritsch, Tony Humphrey (a security STA) informed Plaintiff that he was moving into D.M.'s room. Plaintiff responded "no" and stated that he did not feel safe around D.M. Humphrey replied that Plaintiff had to move. Humphrey radioed Tarry Williams (a DHS Internal Affairs investigator). Williams arrived and instructed Humphrey to move Plaintiff's things into D.M.'s room. Williams told Plaintiff that, if he did not move into D.M.'s room, Plaintiff would be locked in his room without any of his property. Plaintiff did not tell Williams why Plaintiff did not want to room with D.M. Plaintiff stayed in his room and was locked in. Several hours later, Defendant Franzen unlocked Plaintiff's room. Franzen told Plaintiff that he could come and go from his room as he pleased, but that if tried to retrieve his property from D.M.'s room, it would be construed as Plaintiff consenting to room with D.M. Plaintiff moved into D.M.'s room the following day, January 21, 2006. (R. 86, Defs.' Rule 56.1 Statement ¶¶ 18-24; R. 87-2, Pl.'s Depo., 23-30.)

About a week after Plaintiff moved, he complained to Dr. Maieritsch about sharing a room with D.M. Plaintiff told Dr. Maieritsch that D.M. was "being dominant" over the cell – D.M. instructed Plaintiff when D.M. wanted to be alone in the cell, when Plaintiff could enter the cell, when Plaintiff could play his radio, etc. D.M. would also sit in the middle of the cell on or in

a dresser drawer such that Plaintiff would have to brush up against him when leaving the cell. Plaintiff also testified that he did not feel comfortable changing clothes in front of D.M. and that he asked D.M. to leave the room. D.M. responded to Plaintiff's requests by making anti-gay derogatory remarks and saying that nobody wanted to look at Plaintiff. Even when D.M. was not sitting on the drawer, he would keep the drawer in the middle of the room and tell Plaintiff not to disturb it. Dr. Maieritsch told Plaintiff to wait 30 days and, if things did not improve, Plaintiff would be moved to another room. (R. 87-2, Pl.'s Depo. 44-46, 56-60.)

A Progress Note report from Dr. Brenzinger on February 1, 2006, states that Plaintiff reported that he was adjusting to his roommate and that "things are going better." (R. 98-2, Pl.'s Response, Exh. B19.) Dr. Brenzinger's Progress Note states that Plaintiff was going to ask D.M. to make accommodations and that Plaintiff agreed with Dr. Brenzinger to cooperate and compromise with D.M. (*Id.*) Sometime around February 8, 2006, Dr. Brenzinger scheduled a "sit-down" meeting with Plaintiff, Dr. Brenzinger, D.M., and D.M.'s therapist. Plaintiff walked out of the sit-down meeting because he thought that D.M. was not being truthful about his behavior. (R. 86, Defs.' Rule 56.1 Statement ¶ 38; R. 87-6, Pl.'s Depo., 53-56.) After walking out of the meeting, Plaintiff went to his cell, packed up his property, and sat outside the cell.

He informed the STAs on duty at the time that he was not returning to the cell.  The STAs informed the Shift Commander, who informed the STAs to put Plaintiff on "temp security" and move him to another unit.  (R. 87-2, Pl.'s Depo., 55.)  Plaintiff was moved to a different unit, Alpha Unit, for a period of time.  (R. 86, Defs.' Rule 56.1 Statement  ¶40; R. 87-2, Pl.'s Depo. 61-64.)  Plaintiff later appeared before a Behavior Committee for the incident of moving his property out of his cell.  He explained that he was not happy with his roommate.  The committee told Plaintiff that he should move back into his cell, penalized Plaintiff for creating a disturbance, and lowered his status from general to "close management status" for a period of time.  (R. 87-2, Pl.'s Depo., 65-67.)  Plaintiff returned to the cell he shared with D.M. on February 14, 20006.  (*Id.* at 68.)

A Progress Note report for sessions for the week of February 9-13, 2006 states that Plaintiff discussed the February 8, 2009 incident.  Plaintiff told his therapy group that he had taken all of his property out the cell in an attempt to force a move.  (R. 98-2, Pl.'s Response at Exh. B20.)  Plaintiff acknowledged that he was not making "good decisions, but blamed his poor decision making on others, including his roommate, the primaries, the team leaders, and the TDF (Joliet Facility) in general." (*Id.*)  The Progress Note states, "Therapists strongly confronted Mr. Young's victim stance. . . . He was also confronted about his decision to

start smoking to get rid of his initial roommate . . . Other group members encouraged him to view his behavior more objectively and consider that he consistently complains about roommates and then manipulates the system to get rid of them" (*Id.*)

Following Plaintiff's February 14, 2006, return to his cell, he did not have a conflict with D.M. for awhile, except that D.M. continued to place a dresser drawer in the middle of the floor. (R. 86, Defs.'s Rule 56.1 Statement ¶ 41; R. 87-2, Pl.'s Depo., 69.) Around February 26, 2006, Plaintiff fell out of his bunk and injured himself on the dresser drawer. Plaintiff's complaints of pain led to him being assigned to the lower bunk and D.M. being assigned to the top bunk. D.M. accused him of faking. D.M. told Plaintiff that D.M. would close the door to the cell and beat Plaintiff. Plaintiff did not file a grievance about the threat. (R. 86, Defs.' Rule 56.1 Statement ¶ 41; R. 87-2, Pl.'s Depo., 47-48, 69.) Plaintiff complained to Dr. Lea Chankin, who told Plaintiff to put in a request to the Rooming Committee, of which she was a member. (R. 86, Defs.' Rule 56.1 Statement ¶ 53; Pl.'s Depo., 109.) A Progress Note report indicates that Plaintiff put in a room change request around March 7, 2006. (R. 86-4, Dr. Brenzinger's Progress Note Report of 3/7/06.)

Included with the Defendants' summary judgment motion is a declaration by Dr. Lea Chankin (a psychologist who served as Associate Clinical Director of the Joliet Facility and a member of

the Rooming Committee).  (R. 86-4.)  Chankin states that she was the Associate Clinical Director of the Joliet Facility beginning in June 2005 and that part of her duties was to serve as a member of the Rooming Committee.  Chankin explains that the Joliet Facility was operating at full capacity, which required detainees to share cells.  The Rooming Committee decided who to room together "in order to create a therapeutic milieu as well as to minimize incidents of violence and sexual misconduct," and to determine how best to care for residents with unique mental and physical issues. Changing a roommate was thus not simple since it required changing several room assignments.  The Committee received numerous requests for a new roommate.  Further complicating assigning rooms was that many residents would "attempt to live with particular individuals . . . for improper/counter-therapeutic sex or non-consensual sex." (*Id.* at ¶ 9.)  Older residents often sought to room with younger or newly arrived detainees, who were considered more vulnerable. (*Id.*) "If the Committee were to act on every reported threat or sexual innuendo, this would result in daily moves."  (*Id.* at ¶ 10.).

Chankin recalls that Plaintiff sought to change roommates, but that Plaintiff had not obtained statements from his treatment teams or primary therapist.  Nor had Plaintiff demonstrated that he faced a substantial risk of serious harm from D.M.  (*Id.* at ¶¶ 11-12.) Progress Notes from February 26, 2006, and March 7, 2006, state that Plaintiff had problems with his roommate D.M. that Plaintiff

wanted to room with a resident who recently arrived at the facility, and that Plaintiff may have submitted a request to the Rooming Committee to change rooms around that time. (R. 86-4, Exh. D.)

The assault that is the subject of this suit occurred on or around March 10, 2006. (R. 86, Defs.' Rule 56.1 Statement ¶ 7; R. 87-2, Pl.'s Depo., 71.) Plaintiff was sitting in the day room with another detainee (A.R.). The other detainee was washing his clothes in a small laundry area in or near the day room. D.M. came into the room and pressured A.R. to finish drying his clothes so that D.M. could finish his laundry. D.M. and A.R. argued. D.M. told A.R. that if he did not take his clothes out of the dryer, D.M. was going to throw them on the floor. When A.R. went into the laundry room D.M. followed A.R. and attacked him. Plaintiff saw D.M. push A.R. up against the dryer and hit him at least six times. Plaintiff alerted STAs about the assault. The STAs placed the unit on lockdown and everyone had to return to his cell. (R. 86, Defs. Rule 56.1 Statement ¶ 7; R. 87-2, Pl.'s Depo., 72-74.)

When returning to their cell, Plaintiff entered the cell first, with D.M. behind him. Plaintiff was carrying his radio, headphones, and some cassettes. D.M. struck Plaintiff from behind several times on the left side of his head. Plaintiff dropped or put down his radio, headphones, and cassettes in the doorway to the cell. D.M. then pushed Plaintiff into the cell. D.M. continued to hit Plaintiff in the face. Plaintiff felt dizzy and fell to the

floor and was laying on his stomach in the doorway of the cell, half in and half out of the cell. (R. 86, Defs.' Rule 56.1 Statement ¶ 7; R. 87-2, Pl.'s Depo., 74-77.) The cell door could not close because Plaintiff was laying in the doorway. D.M. attempted to drag Plaintiff into the cell. An STA saw Plaintiff fall, came to the cell, and told D.M. to "back up off" Plaintiff. (R. 86, Defs.' Rule 56.1 Statement ¶ 8; R. 87-2, Pl.'s Depo., 77-78.)

Plaintiff and A.R. went to the medical unit. (R. 86, Defs.' Rule 56.1 Statement ¶ 9; R. 87-2, Pl.'s Depo. 78-79.) Plaintiff sustained a cut above his lip and the right side of his head was swollen. He received a butterfly band-aid for his lip, which hurt for about three days. He had headaches for several weeks, for which he was treated at the healthcare unit. (R. 86, Defs. Rule 56.1 Statement ¶ 9; R. 87-2, Pl.'s Depo., 81-85; R. 98-2, Pl.'s Response, Exh. C-6.) Plaintiff did not room with D.M. after this incident. (R. 87-2, Pl.'s Depo. 86.)

## B. Equal Protection of African-American Detainees

Plaintiff contends that African-American detainees were treated differently from Caucasian detainees. Plaintiff alleged that he was discouraged from filing grievances; he was not allowed to choose his roommates; and African-American detainees are considered more aggressive than other detainees. (Complaint at 8.) More specifically, Plaintiff's discrimination claims are based upon the Rooming Committee's denial of his requests for certain

roommates and general allegations that African-American detainees are treated more harshly than other detainees. (*Id.*; R. 87-2, Pl.'s Depo., 93-100.)

The evidence shows that the Rooming Committee denied Plaintiff's requests to room with two detainees A.R. and D.W. (R. 86-4, Chankin's Declaration, 3.) Dr. Chankin explains in her declaration that Plaintiff had been disciplined for sexual misconduct while in prison before his arrival at the Joliet Facility (Plaintiff and four other prisoners were disciplined for a rape). Plaintiff had also reportedly engaged in consensual sex with several prisoners. (*Id.*; R. 87-2, Pl.'s Depo., 100-02.) Dr. Chankin stated that Plaintiff's roommate requests were denied because it appeared that Plaintiff wanted to room with the residents for his own sexual gratification. (R. 86, Defs.' Rule 56.1 Statement ¶ 69; R. 86-4, Chankin's Declaration, 3.) Plaintiff does not contest this explanation for the denial of his roommate requests. However, Plaintiff submits in response a grievance filed by another detainee (Ronald Walker) in March 2006 where Walker listed Caucasian residents who allegedly were allowed to choose their roommates. (R. 98-2, Attachment to Pl.'s Response, 50.) The grievance response states that rooming residents involved several factors that Walker could not compare his circumstances to those of other residents, and that Walker had not submitted a roommate request at that time. (*Id.* at 51.)

With respect to Plaintiff's claim that African-Americans are treated more harshly, Plaintiff submits four identical affidavits from four detainees. (R. 98-2, Pl.'s Response, Exhs. 1C-1F.) The affidavits state that African-American detainees are treated as though they are the most dangerous persons. The affidavits, however, neither state specific examples nor indicate that African-American detainees are treated differently than other detainees. (*Id.*)

### III.  ANALYSIS

As a civil detainee, Plaintiff's claim of deliberate indifference to his safety falls within the Fourteenth Amendment's Due Process Clause, as opposed to the Eighth Amendment's protection against cruel and unusual punishment. However, the due process rights of detainees are at least as strong as the protections afforded convicted prisoners, and courts refer to the standards stated in Eighth Amendment jurisprudence when addressing the claim for a civil or pretrial detainee. *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir., 2005); *Fisher v. Lovejoy,* 414 F.3d 659, 661-62 (7th Cir., 2005).

### A.  Deliberate Indifference to Plaintiff's Safety

Under the Eighth Amendment, prison officials have a duty to "take reasonable measures to guarantee the safety of . . . inmates," in particular to protect them from violence from other inmates. *Brown*, 398 F.3d at 909 (*quoting Farmer v. Brennan,* 511 U.S. 825, 832 (1994)). "Because officials have taken away

virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir., 2008) (*quoting Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir., 2001)). However, not every attack by a detainee results from a constitutional failure to protect. A constitutional violation exists only if the official acted with deliberate indifference. *Dale*, 548 F.3d at 569.

To establish deliberate indifference, the detainee must prove both that the official was aware "that a substantial risk of serious harm exist[ed]," and the official "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 837, 847 (1994). The standard contains both objective and subjective components. The risk of harm must be objectively serious. But, the official's knowledge of the risk of harm is subjective, and there must be evidence that the official was actually be aware of the risk. *See Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir., 2005). A detainee may be able to demonstrate actual knowledge "by showing that he complained to officials about a specific threat to his safety." *McGill v. Duckworth*, 944 F.2d 344, 359 (7th Cir., 1991).

Once prison officials know about a serious risk of harm, they have an obligation "to take reasonable measures to abate it." *Dale,* 548 F.3d at 569 (*citing Borello v. Allison*, 446 F.3d 742, 747 (7th Cir., 2006)). An official's response may be reasonable even

if it fails to prevent the harm.  *Dale*, 548 F.3d at 569.  Even if the official knew that the detainee faced a substantial risk of harm, the official is not liable simply because he or she did not prevent the harm.  "[T]he mere failure of the prison official to choose the best course of action does not amount to a constitutional violation."  *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir., 2002) (*citing* Farmer, 511 U.S. at 844).  So long as the official's response was reasonable, even if not correct or the best response, he or she did not act with deliberate indifference.  Furthermore, the official's failure to protect must result from his or her deliberate indifference.  Proving negligent or even grossly negligent behavior is insufficient.  Rather, the official's actions must have been equivalent to criminal recklessness.  *Fisher v. Lovejoy*, 414 F.3d at 662 (*citing Farmer*, 511 U.S. at 835-37).

In addition to a serious risk of injury and deliberate indifference to that risk, a Section 1983 plaintiff must establish causation, *i.e.*, that the defendants' constitutional wrong caused the plaintiff's injuries.  *Grieveson v. Anderson,* 538 F.3d 763, 773 (7th Cir., 2008) (*citing Butera v. Cottey*, 285 F.3d 601, 608 (7th Cir., 2002).  If the injury would have happened irrespective of the constitutional tort asserted by the plaintiff, he cannot succeed on his § 1983 claim.  *Id.*

In this case, Plaintiff can demonstrate neither deliberate indifference nor causation. With respect to assigning Plaintiff and D.M. to the same cell, Plaintiff stated that he feared an assault

or sexual advances by D.M. because D.M. twice before threatened Plaintiff with violence and once "flirted" with Plaintiff by asking inappropriate personal questions. However, prior to the room assignment, Plaintiff told only one Joliet Facility staff member (Dr. Roth) about just one of these incidents (D.M.'s comment that he would hit Plaintiff in the mouth if he continued "being smart"). (R. 87-2, Pl.'s Depo., 18-23, 114.) Plaintiff was never assaulted by D.M. before they shared a cell. Nor had Plaintiff ever requested to be placed in a separate unit from D.M. when they lived in the same unit. (*Id.* at 121.) Plaintiff's telling Dr. Roth (who was not on the Rooming Committee) about one comment by D.M. cannot demonstrate that any of the Defendants knew not to house Plaintiff and D.M. in the same room. There is no question of material fact that the Defendants did not act with deliberate indifference when assigning Plaintiff and D.M. to room together.

Plaintiff also cannot establish deliberate indifference with respect to his complaints after he learned that he and D.M. were going to share a cell. Although Plaintiff informed Dr. Brenzinger, Moore, Strock, and Maieritsch of his concerns about rooming with Plaintiff, as discussed above, Plaintiff's complaint of the three prior incidents with D.M. were not very serious (two off-the-cuff threats of violence and possible flirting). But even assuming that the prior threats were serious, none of the Defendants ignored Plaintiff's complaints. Upon informing Moore, Strock, and Maieritsch that Plaintiff did not want to room with D.M., Strock

and Maieritsch responded that they would see if they could prevent the move and Moore spoke to D.M. about whether he had issues with Plaintiff. (*Id.* at 33-36.) Maieritsch also told Plaintiff that if things did not work out with D.M. after 30 days, Plaintiff should then be able to change roommates. Progress Note reports demonstrate that Plaintiff and his therapist, Dr. Brenzinger, discussed the issue of Plaintiff and D.M. rooming together, that Plaintiff reported on several occasions that their situation was improving, and that, when Plaintiff complained about D.M. being dominant over the cell, Dr. Brenzinger scheduled a sit-down meeting between Plaintiff and D.M. with their therapists present. (*Id.* at 53-56; R. 98-2, Pl.'s Response, Exh. B19.) Upon Plaintiff telling Dr. Lea Chankin that he did not want to room with D.M., Chankin instructed Plaintiff to submit a request to change roommates with the Rooming Committee. (R. 87-2, Pl.'s Depo., 109.) None of the Defendants ignored Plaintiff's pleas not to room with D.M. At best, Plaintiff could prove only negligence with respect to the Defendants' reactions.

After Plaintiff moved into D.M.'s cell, D.M. threatened Plaintiff only once – D.M. told Plaintiff that if D.M. found out that Plaintiff was faking an injury to get the bottom bunk, D.M. would hit him. However, Plaintiff did not report this threat. The main complaint Plaintiff voiced after moving in with D.M. was that he was being "dominant" over the cell, i.e., instructing Plaintiff how to behave in the cell and sitting in a drawer in the middle of

the cell.  In response to these complaints, as noted above, Dr. Brenzinger scheduled a sit-down meeting, and Dr. Chankin told Plaintiff to submit a request to the Rooming Committee.  The evidence thus reveals that Plaintiff cannot demonstrate that the Defendants acted with deliberate indifference by not moving Plaintiff out of D.M.'s cell.

Additionally, the events leading up to the March 10, 2006, assault indicate that Plaintiff would have been assaulted even if he did not share a room with D.M.  According to Plaintiff, the assault occurred as a result of Plaintiff reporting a fight between D.M. and another resident (A.R.), which forced a lockdown.  D.M. struck Plaintiff as he was walking into their cell before the cell doors closed.  Plaintiff admitted that he could have been attacked even if he and D.M. did not share a cell.

The evidence thus demonstrates that Plaintiff cannot prove that the Defendants acted with deliberate indifference to Plaintiff's safety by having him and D.M. share a cell.  Nor can Plaintiff show, even if he could demonstrate deliberate indifference, that the assault occurred because of Plaintiff's sharing of a cell with D.M.  For these reasons, the Court grants Defendants' motion for summary judgment and dismisses Plaintiff's deliberate indifference claim.

### B.  Discrimination Against African-American Detainees

To succeed on an Equal Protection claim, a plaintiff must prove that he is a member of a protected class, that he is

otherwise similarly situated to members of the unprotected class, and that he was treated differently from members of the unprotected class. *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir., 1993). A plaintiff must show that the defendants' actions both had a discriminatory effect and were motivated by a discriminatory intent. *Chavez v. Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir., 2001). A person bringing an action under the Equal Protection Clause may not merely show that he was treated unfairly as an individual; "the gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of a person aggrieved by the state's action." *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir., 1982); *Webb v. Budz*, 480 F.Supp.2d 1050, 1056-57 (N.D.Ill., 2007). Plaintiff cannot make the requisite showing in this case.

Plaintiff stated in his complaint that his claims of discrimination were based upon (1) Caucasian residents being able to choose roommates while African-American residents could not, and (2) African-American residents being treated more harshly than Caucasians. (R. 1, Complaint 8). While such allegations were enough to allow Plaintiff survive a motion to dismiss, it is now clear that Plaintiff cannot make the requisite showing to prove this claim.

In support of his claim that Caucasian residents could choose their roommates, Plaintiff submits a grievance submitted by another detainee (Ronald Walker) which asserted the similar conclusory

allegations about Caucasians being able to choose roommates. The grievance includes a list of Caucasian residents who were allowed to choose, while African-American residents were not. (R. 98-2, Pl.'s Response, Exh. 2G.) In response to Walker's grievance, the grievance examiner explained that Walker could not compare himself to others who were not similarly situated and that Walker had not submitted a request to change roommates. (*Id.*) Dr. Chankin, a member of the Rooming Committee submitted a declaration stating that roommate decisions were not an easy task and required consideration of several factors (compatibility, protection, and security). Dr. Chankin explained that the denials of Plaintiff's roommate requests were based upon a concern that Plaintiff might sexually abuse or take advantage of the requested roommate. (R. 86-4, Chankin's Declaration, 2-3.) Plaintiff does not contest Chankin's declaration. Rather, he submitted the grievance filed by another detainee and repeats his contention that African-American detainees were not allowed to choose their roommates while Caucasian detainees were afforded such a privilege. (R. 98-2, Pl.'s Response, 5 and Exh. 2G.) "The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). Plaintiff has not shown an issue of material fact with respect to his claim African-American detainees were treated differently concerning the ability to choose roommates.

With respect to Plaintiff's contention that African-American detainees were treated or punished more harshly than Caucasian detainees, Plaintiff submits identical affidavits from four detainees that state that the Joliet Facility " practi[ces]e racial discrimination with African-Americans when placing them in housing, African-Americans are looked upon and treated as the most violent people in the program." (R. 98-2, Pl.'s Response, Exhs. 1C-1F.) Again, Plaintiff has not submitted proof of his conculsory assertions, but has simply submitted the same conclusory allegations in affidavits by other detainees. When asked to specify how African-American detainees are treated differently, Plaintiff referred to one occasion when a Caucasian detainee (J.A.) was not forced to move back into a cell after he committed the same offense that Plaintiff committed. (R. 87-2, Pl.'s Depo., 97-98.) However, Plaintiff admitted that J.A. was allowed not to move back into a cell with his roommate, because the roommate had assaulted J.A. At the time Plaintiff was forced to move back into a cell with D.M. following Plaintiff's time in segregation-type confinement in February 2006, he had not been assaulted by D.M. (*Id.* at 98-100.) After Plaintiff was assaulted by D.M., they were housed in separate cells. (*Id.* at 86.)

Plaintiff has not submitted any evidence to support his allegations of racial discrimination. "[W]hen confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must

affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir., 1988); *see also Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois*, 424 F.3d 659, 669 (7th Cir., 2005). It is clear at this stage of the proceedings that Plaintiff cannot succeed on his claim of racial discrimination. This claim is dismissed.

## IV. CONCLUSION

For the reasons stated herein, the Court grants the Defendants' motion for summary judgment and dismisses Plaintiff's remaining claims (1) that the Defendants acted with deliberate indifference to Plaintiff's safety by assigning him to share a room with D.M. and by keeping them as roommates even after Plaintiff complained, and (2) that African-American detainees were treated differently than Caucasian detainees. Plaintiff's claims are dismissed and this case is terminated. All pending motions not herein addressed are denied.


**IT IS SO ORDERED**.

_____
      Harry D. Leinenweber, Judge
      United States District Court

**DATE:** 8/31/2009